UNITED STATES of America, Plaintiff,

v.

Grantly Morris CLARKE, Defendant.

Crim. A. No. 95–02–JLL.

United States District Court,
D. Delaware.

March 8, 1995.

Gregory Sleet, U.S. Atty., and Edmond Falgowski, Asst. U.S. Atty., Wilmington, DE, for plaintiff.

Christopher S. Koyste, Asst. Federal Public Defender, Wilmington, DE, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LATCHUM, Senior District Judge.

### I. Introduction and Findings of Fact

The Court held a hearing on February 27, 1995, on defendant's motion to suppress and his motion to dismiss Count I, (Docket Item ["D.I."] 13), and after due consideration makes the following findings of fact:

On December 27, 1994, at approximately 1:30 P.M. the defendant, Grantly Morris Clarke, was stopped while driving a 1988 Toyota Camry in the vicinity of 30th and Market Streets in the city of Wilmington, Delaware, by Wilmington Police Officer Liam Sullivan and Deputy U.S. Marshall Brian Sheely. This area, known as "the strip," is a high crime area, which Officer Sullivan testified had a large number of stolen vehicles. Officer Sullivan's attention was laid upon the vehicle because the vehicle was cruising, i.e. driving slowly with the occupants looking around frequently, and the vehicle had New York tags, a situation that according to Officer Sullivan in his experience made it more likely than normal that the vehicle was stolen. Officer Sullivan decided to call in the license plate tag number. After receiving the tag number's registration information, Officer Sullivan stopped the vehicle because the license number was registered as a gray Toyota Camry and the vehicle he was observing was a champagne-colored Toyota Camry. While Officer Sullivan indicated that color difference was the primary reason for the stop, he also testified that the fact that the vehicle was registered to a female and that there were only two males in the car contributed to his decision to stop the vehicle. In addition, Officer Sullivan testified that Toyota Camry's were very commonly stolen and the presence of all the above factors in combination with the fact that the vehicle had New York tags led to his decision.

After being stopped, the defendant indicated that he did not have a driver's license but instead presented Officer Sullivan with what appeared initially to be a valid Alien Registration Card (commonly known as a "green card") issued to a Jamaican national named William Henry Morrison. At this point Officer Sullivan asked both the driver and passenger to step out of the vehicle and searched them for weapons; the interior compartment of the vehicle was also searched. Officer Sullivan found no contraband and told the defendant and his passenger to return to their vehicle and await his summonses. Officer Sullivan returned to his unmarked police car to write the summonses. Officer Sullivan was aware that a United States Immigration and Naturalization Service ("INS") agent was assigned to and present at the Wilmington Police Station and decided to call the agent to investigate the scene. Between 10 and 15 minutes later, INS Agent Egbert arrived and, after being shown the defendant's identification by Officer Sullivan, immediately identified the "green card" as fraudulent. Agent Egbert then asked the passenger for identification. The passenger indicated that he was a Jamaican but did not have his identity papers. Agent Egbert asked the passenger, who identified himself as Bertram George Furgus Clarke, to step out of the car, read him his *Miranda* rights, and arrested him for failure to present proper identification. Agent Egbert then asked the driver of the vehicle to step outside of the car, read him his *Miranda* rights, and arrested him for presenting fraudulent United States identity documents.

After being transported to the Wilmington Police Station, the defendant revealed his true identity as Grantly Morris Clarke and indicated that he had been previously convicted of a drug offense. A check on the defendant's immigration record revealed that he had been previously deported. His passenger, the defendant's brother, had no prior record.

The defendant has been indicted on three counts: (1) illegally re-entering the United States after being deported, a violation of 8 U.S.C. § 1326(a) and (b)(1); (2) falsely identifying himself to be another individual, a violation of 18 U.S.C. § 1001; and (3) presenting a fraudulent identification card, a violation of 18 U.S.C. § 1028(a)(4) and (b)(3). The defendant brings this motion to suppress all evidence obtained as a result of the traffic

stop by Officer Sullivan on December 27, 1994, on the grounds that (1) Officer Sullivan did not have reasonable suspicion to stop the car driven by the defendant, (2) documents and statements were taken in violation of the defendant's Fifth and Sixth Amendment rights, and (3) that the defendant's prior deportation hearing was fundamentally unfair in that the Immigration Law Judge did not advise the defendant of his right to appeal and as a result this deportation hearing cannot be used as an element of the offense charged in Count I: illegally re-entering the United States after having been deported.

## II. Conclusions of Law

### A. Officer Sullivan Had The Requisite Reasonable Suspicion Needed To Stop A Vehicle.

The Supreme Court has held that if a police officer has at least an articulable and reasonable suspicion that "a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law," then the officer may stop the automobile to investigate further. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979). Objective factors must support this suspicion. *United States v. Hawkins*, 811 F.2d 210, 213–15 (3d. Cir.), *cert. denied*, 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987). This Court finds that Officer Sullivan did in fact have an articulable and reasonable suspicion that the driver and passenger of the vehicle were in violation of the law. When Officer Sullivan checked the vehicle's tag number it was revealed that the tag number was registered to a different color car. Such a discrepancy, combined with Officer Sullivan's knowledge that Toyota Camrys are often subject to theft, the vehicle's out-of-state license plate, and the presence of the vehicle in a high crime area is sufficient for Officer Sullivan to stop the car and investigate further.

### B. The Defendant's Statements Were Not Taken In Violation Of Miranda.

A motorist is not "in custody" for the purposes of *Miranda* during a traffic stop. *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). The police may ask the motorist "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439, 104 S.Ct. at 3150. Therefore, all statements made by the defendant prior to the arrival of INS Agent Egbert are admissible.

After his arrest and transport to the police station the defendant volunteered his true identity and that he had a prior drug conviction. A defendant subject to "custodial interrogation" must be given his *Miranda* rights, which can only be waived knowingly, intelligently, and voluntarily. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). In order to make this determination, the Court must look to the totality of the circumstances analyzing the voluntary waiver component separately from the knowing and intelligent waiver component. *United States v. Velasquez*, 885 F.2d 1076, 1086–87 (3d Cir.1989), *cert. denied*, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990). In addition, the prosecution must prove the waiver by a preponderance of the evidence. *Id.* at 1086 The defendant is a mature adult who has familiarity with the criminal justice system as evidenced by his prior drug conviction. The defendant has not complained that he did not understand the rights he was waiving, and therefore the Court concludes that the defendant possessed "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it," *id.* at 1087 (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141), and thus his waiver was knowingly and intelligently made. The test for voluntariness is whether the statement was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. At the hearing it was established that INS Agent Egbert read the defendant his *Miranda* rights immediately after arresting him, and that the defendant indicated he understood his rights. The defendant was then transported to the police station where he revealed his true identity and indicated that he had been convicted for

a drug offense. Agent Egbert testified that the defendant waived his rights voluntarily. No evidence was presented by defendant to the contrary. Therefore, this Court finds that defendant's Fifth Amendment rights were not violated.[1]

### C. Defendant's Prior Deportation Hearing Was Not Fundamentally Unfair.

██ Defendant next contends that the evidence of his prior deportation should be suppressed because the hearing was fundamentally unfair and thus violated his right to due process because he was not advised of his right to appeal. In *United States v. Mendoza–Lopez*, 481 U.S. 828, 838, 107 S.Ct. 2148, 2155, 95 L.Ed.2d 772 (1987), the Supreme Court ruled that a defendant charged with re-entry after deportation, in violation of 8 U.S.C. § 1326, could collaterally challenge the validity of the deportation hearing. In *Mendoza–Lopez,* the Supreme Court declined to enumerate which procedural defects "are so fundamental that they may functionally deprive the alien of judicial review, requiring that the result of the hearing in which they took place not be used to support a criminal conviction." *Id.* at 839 n. 17, 107 S.Ct. at 2155 n. 17. In response, several circuits have adopted a two-step approach to deciding whether a defendant can successfully prevent a deportation from being used to prove an element of a criminal offense:

> [T]he defendant must first show that the deportation hearing effectively foreclosed his right to direct judicial review of the deportation order. Second, he must show that the deportation hearing was fundamentally unfair. In other words, he must show that he was prejudiced by the Immigration Judge's failure to inform him of his

rights to seek a suspension of deportation or to appeal, because an informed exercise of those rights would have yielded him relief from deportation.

*United States v. Espinoza–Farlo,* 34 F.3d 469, 471 (7th Cir.1994); *see also United States v. Mendoza–Lopez,* 7 F.3d 1483, 1485 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1552, 128 L.Ed.2d 201 (1994) (finding that defendant failed to meet either test).

A review of the deportation hearing transcript, (D.I. 15, Ex. A), clearly reflects that the defendant is unable to show either that he was effectively foreclosed from direct judicial review or that he would have received relief had he appealed his deportation order. As a reading of the transcript plainly reveals, the defendant was properly advised of his right to appeal and declined to do so through his counsel. The defendant's testimony to the contrary at the suppression hearing was incredible. Furthermore, even if the defendant had been deprived of his right to appeal, the defendant has not come forward with any evidence whatsoever that had he appealed or applied for discretionary relief, such relief would have been granted. Absent any showing on the part of the defendant this Court must find that the defendant has failed to demonstrate that he was entitled to relief from the deportation order.[2] The defendant, therefore, has not demonstrated that his prior deportation cannot be used against him in a subsequent criminal proceeding.

### III. Conclusion

This Court finds that the defendant's claims are without merit, that the defendant was properly stopped, arrested, and questioned. In addition, this Court finds that the defendant's prior deportation hearing was not fundamentally unfair. Defendant's mo-

---

1. Defendant's Sixth Amendment argument is wholly without merit and shall not be addressed further.

2. The Assistant United States Attorney ("AUSA") catalogued the most commonly used deportation defenses and convincingly argued each section's inapplicability to the defendant's circumstances. Defense counsel made no contrary representations.

  The sections covered by the AUSA were: (1) voluntary departure pursuant to 8 U.S.C.A.

§ 1254(e) (West Supp.1994); (2) stay of deportation pursuant to 8 C.F.R. § 243.4 (1994); (3) suspension of deportation pursuant to 8 U.S.C.A. § 1254(a)(1) (West 1970 & Supp.1994); (4) waiver of deportation pursuant to 8 U.S.C.A. § 1182(c) (West Supp.1994); (5) adjustment of status, pursuant to 8 U.S.C.A. § 1255(a) (West Supp.1994); and (6) asylum and withholding of deportation pursuant to 8 U.S.C.A. § 1158(a) (West Supp.1994).

tion to suppress and his motion to dismiss Count I will be denied and an order to this effect will issue forthwith.