NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1635
_____

UNITED STATES OF AMERICA,

v.

ALEJANDRO MEZA-MAGALLON,
a/k/a Alejandro Mesa-Cruz,
a/k/a Leonardo Hernandez,
a/k/a Mario Luna-Gomez,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. No. 2-17-cr-00379-001)
Honorable R. Barclay Surrick, District Judge

_____

Argued on February 13, 2019

BEFORE: HARDIMAN, SCIRICA, and COWEN, <u>Circuit</u> <u>Judges</u>

(Filed: July 2, 2019)

Keith M. Donoghue
        Assistant Federal Defender
Brett G. Sweitzer
        Assistant Federal Defender
        Chief of Appeals
Leigh M. Skipper
        Chief Federal Defender
Jacob Schuman       [ARGUED]
        Research and Writing Attorney
Federal Community Defender Office for Eastern District
601 Walnut Street

The Curtis Center, Suite 540 West
Philadelphia, PA 19106
       *Counsel for Appellant*

William M. McSwain
       United States Attorney
Robert A. Zauzmer
       Assistant United States Attorney
       Chief of Appeals
Bernadette McKeon      [ARGUED]
       Assistant United States Attorney
Josh A. Davison
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
       *Counsel for Appellee*

_____

OPINION[*]

_____

COWEN, <u>Circuit</u> <u>Judge</u>.

Alejandro Meza-Magallon appeals from the criminal judgment entered by the United States District Court for the Eastern District of Pennsylvania. Meza specifically challenges the District Court's denial of his motion to dismiss the charge of illegal reentry on the basis of a collateral challenge to the underlying deportation order. Because we agree with the District Court that Meza has failed to establish the requisite prejudice, we will affirm.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Meza was indicted on one count of illegal reentry under 8 U.S.C. § 1326(a) and (b)(1) and a single count of interfering with a United States Immigration and Customs Enforcement officer while in the performance of his duties under 18 U.S.C. § 111(a)(1). 8 U.S.C. § 1326(d) permits a collateral challenge to the validity of the underlying deportation order in certain limited circumstances. Citing this subsection, Meza filed a motion to dismiss the illegal reentry charge.

Specifically Meza challenged his deportation order, entered in 2002, on the grounds that the "Stipulated Request for Issuance of Final Order of Removal, Waiver of Appearance and Hearing" ("Stipulated Request") he signed constituted an invalid waiver. He argued that, as a minor, he was deprived of a fundamentally fair hearing because no notice was provided to his parents or guardians. Furthermore, he asserted that he was incapable of understanding the Stipulated Request because it was written in English. These errors purportedly deprived Meza of an opportunity to request voluntary departure.

At the evidentiary hearing, Meza testified on his own behalf, and the government presented the testimony of Jay Varda, an immigration agent. The District Court denied Meza's motion to dismiss. It rejected his waiver and parental notice arguments, determining that he failed to satisfy the three statutory prerequisites for a collateral attack on his prior deportation order. With respect to the "fundamental unfairness" requirement, the District Court considered whether Meza established that the alleged fundamental defect resulted in prejudice. "To show prejudice under § 1326(d)(3), an alien must establish that there was a reasonable likelihood that the result would have been different

if the error in the deportation proceeding had not occurred." (A34 (citing United States v. Charleswell, 456 F.3d 347, 361-62 (3d Cir. 2006)).) While acknowledging that he "was statutorily eligible for voluntary departure" (A35), the District Court determined that Meza "cannot establish that there was a reasonable likelihood he would have been granted voluntary departure relief." (A37.) The District Court viewed Meza as an unsympathetic figure with "significant negative equities and few positive ones." (A38.) In short, Meza's positive equities (i.e., he had lived in the United States for three years, and his mother, aunts, and uncles resided here) were outweighed by a number of significant negative factors (including Meza's state convictions for burglary and battery, his gang membership, the fact he was not married to anyone in the United States, his lack of children, and his evidentiary hearing testimony indicating that he was unemployed, had not attended any school in the United States, and could not speak English).

Meza pled guilty to both charges, while reserving the right to appeal the District Court's denial of his motion to dismiss. He was sentenced to 16 months of imprisonment on the illegal reentry count together with a concurrent term of 12 months on the other charge. The District Court also imposed a term of three years of supervised release.

II.

Codifying <u>United States v. Mendoza-Lopez</u>, 481 U.S. 828 (1987), Congress

enacted § 1326(d):

> **(d) LIMITATION ON COLLATERAL ATTACK ON UNDERLYING DEPORTATION ORDER**
>
> In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that—
>
> (1) **t**he alien exhausted any administrative remedies that may have been available to seek relief against the order;
>
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>
> (3) the entry of the order was fundamentally unfair.

Meza and the government focus on the third "fundamental unfairness" requirement. "To

establish that a deportation proceeding was fundamentally unfair, an alien must show

both that there was a fundamental defect in the proceeding and that the defect caused him

prejudice."[1] <u>Richardson v. United States</u>, 558 F.3d 216, 224 (3d Cir. 2009) (citing

<u>Charleswell</u>, 456 F.3d at 358).

Initially, the parties vigorously dispute whether or not Meza has established that

the 2002 deportation proceeding violated his due process rights and was fundamentally

unfair because the government deported him pursuant to his waiver without first

_____

[1] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231, and we possess appellate jurisdiction under 28 U.S.C. § 1291. We exercise de novo review over the District Court's legal conclusions disposing of Meza's § 1326(d) challenge. <u>See, e.g.</u>, <u>Charleswell</u>, 456 F.3d at 351. The District Court's findings of fact are reviewed for clear error. <u>See, e.g.</u>, <u>id.</u>

providing notice of the proceeding to his mother. We need not—and do not—decide this question because we agree with the government and the District Court that Meza has failed to establish that the absence of parental notice prejudiced him.

"[W]e agree with the majority of courts that prejudice requires a reasonable likelihood that the result would have been different if the error in the deportation proceeding had not occurred." Charleswell, 456 F.3d at 361-62 (footnote omitted). Accordingly, we rejected the Ninth Circuit's lower "plausibility" standard (in which the defendant need only show that there was some plausible legal challenge that could have been pursued had there been no defect).[2] Id. Meza argues that, if his mother had received notice, she would have advised him not to waive his right to challenge his removal and to instead seek voluntary departure under 8 U.S.C. § 1229c (or at the very least, she could have helped him secure counsel who would have given him the same advice).[3] The parties agree on the basic principles governing voluntary departure

---

[2] Meza asks us to treat the alleged defect here as presumptively prejudicial. (See, e.g., Appellant's Brief at 28 ("In view of minors' incapacity to navigate immigration proceedings in the absence of adult guidance, allowing a minor to waive his right to contest removal without notice to his known U.S.-resident mother is one such defect [triggering a presumption of prejudice].").) In a footnote, we acknowledged that some courts have recognized that the "reasonable likelihood" standard is not necessarily fixed and that some procedural defects may be so critical to procedural legitimacy (and the difficulty of actually proving prejudice so great) that the defendant need not establish a reasonable likelihood of a different result. Charleswell, 456 F.3d at 362 n.17. However, Meza does not cite to any case law applying a presumption of prejudice where the government purportedly failed to provide adequate notice before obtaining a waiver of a minor's right to challenge removal. In fact, neither Meza nor Charleswell have identified any decision actually applying this presumption (as opposed to indicating that there may be some hypothetical case warranting such a presumption). See id.

[3] Voluntary departure is generally preferable to removal. See, e.g., Perez-Funez v. Dist. Director, I.N.S., 619 F. Supp. 656, 659 (C.D. Cal. 1985) ("Its advantages to the

6

requests, although they disagree as to Meza's chances of obtaining such relief. The decision whether to grant voluntary relief turns in large part on administrative discretion. See, e.g., In re Arguelles-Campos, 22 I. & N. Dec. 811, 817 (BIA 1999). "[M]any factors may be weighed in exercising discretion with voluntary departure applications, including the nature and underlying circumstances of the deportation ground at issue; additional violations of the immigration laws; the existence, seriousness, and recency of any criminal record; and other evidence of bad character or the undesirability of the applicant as a permanent resident." Id. (citing In re Gamboa, 14 I. & N. Dec. 244 (BIA 1972).) This discretion may be favorably exercised even in the face of adverse equities if "there are compensating elements such as long residence here, close family ties in the United States, or humanitarian needs." Id. (citing Gamboa, 14 I. & N. Dec. at 248).

According to Meza, he would have been "a strong candidate" for voluntary departure. (Appellant's Brief at 28.) We cannot agree. Considering the serious negative equities together with the relatively weak positive ones, Meza was an exceedingly poor candidate for this form of discretionary relief.

The government and the District Court have appropriately highlighted the various negative factors weighing against Meza. The District Court noted "first that at the time of his deportation, [Meza] had just been convicted of and been imprisoned for burglary." (A37.) Shortly before this conviction, he had entered a guilty plea to a charge of battery. While his criminal history viewed in isolation may not have been prohibitively serious

alien are that it has no adverse impact upon future lawful attempts to enter the United States (as contrasted with a formal deportation order), and it normally reduces the alien's time in detention.").

(e.g., he was apparently sentenced to 116 days' incarceration and two years of probation for burglary and received no sentence at all for battery), the District Court found that Meza was a member of a known gang:

> Similarly, while [Meza] had not been convicted of any gang-related activities, he had been brought to the attention of Agent Varda's gang task force at INS because of his alleged affiliation with a gang in Chicago. [(A109, A111.)]  The "INS Record of Deportable/Inadmissible Alien" form filled out by Agent Varda on June 27, 2002 states that [Meza] is a "self-admitted member of the Bensenville, IL Sureno's (13) street gang." [(A209.)]  This is corroborated by Agent Varda's handwritten notes from his interview with [Meza], which also contain the notation "Sureno's '13.'" [(A257.)]  [Meza's] gang membership counts as another significant negative equity arguing against the reasonable likelihood that he would have been granted voluntary departure.

(A38.)  It is uncontested that Meza "had not attended any school in the U.S."  (Id.)  Meza's father lived in Mexico.

Weighed against these serious negative equities, the positive equities stand out as relatively insignificant and as insufficient to establish a reasonable likelihood that Meza would have been granted the privilege of voluntary departure.  Meza was brought to this country by his mother when he was only 14 years old "to live with his aunts and uncles in Chicago" (Appellant's Brief at 3-4 (citing A12, A15, A257; Presentence Investigation Report at 9) and was only 17 year old at the time of the deportation proceeding.  "Despite the fact that Meza was in the United States for only three years and was just short of 18 years old, he had two criminal convictions, including the recent conviction for burglary which resulted in the deportation proceeding."  (Appellee's Brief at 39-40.)  The District Court rejected Meza's testimony at the evidentiary hearing that he did not understand English, and Agent Varda's notes indicated that he worked as a laborer for six dollars an

hour.  Meza, however, thereby never attended school in the United States, even though he purportedly "spent most of his adolescence in this country" (Appellant's Reply Brief at 13 (citing A12)).  We also cannot overlook the District Court's undisputed factual finding regarding Meza's gang membership.

In his reply brief, Meza contends that "[d]ecisions from the Board of Immigration Appeals [('BIA')] demonstrate that Mr. Meza's youth and family ties made it reasonably likely that he would have been granted voluntary departure, despite his prior convictions."  (Id. at 13.)  However, these distinguishable BIA decisions further confirm that Meza was an unlikely candidate for voluntary departure.  In the first case he cites, the BIA sustained the alien's appeal from the immigration judge's denial of voluntary departure, but it did so based on the existence of numerous positive factors weighed against only one adverse equity.  In re Ruiz Reyes, 2017 WL 4736611, at *1-*2 (BIA Aug. 15, 2017) (unpublished decision).  While Meza entered the country when he was 14, lived here for only three years, "was not altogether incapable of communicating with English speakers" (Appellant's Reply Brief at 13 -14 (footnote omitted) (citing A23, A257)), and never attended school in this country, Ruiz Reyes entered the United States when he was only 4 years old, "has a long residence (14 years) in the United States," "speaks English fluently and is Americanized," and "was attending high school and near graduation when he was arrested and detained," id. at *1.  Ruiz Reyes also had (in addition to family members in the country) "United States citizen siblings," and he planned to marry his longtime citizen girlfriend.  Id.  He was even granted DACA ("Deferred Action for Childhood Arrivals") status.  Id.  "The respondent's sole adverse

9

factor is his 2016 conviction for possession of less than 1 gram of cocaine. For this offense, he was sentenced only to community supervision. He has no other arrests or convictions. The respondent has filed a writ to vacate this conviction on constitutional grounds." Id. at *2. In contrast, Meza "was not married to anyone in the U.S." (A38.) Meza had two prior convictions, had been sentenced to serve some time in jail, and there is no indication that his convictions were subject to challenge. Finally, Ruiz Reyes was never identified as a gang member.[4]

III.

For the foregoing reasons, we will affirm the criminal judgment entered by the District Court.

---

[4] According to Meza, "the Board's decision in [In re Maldonado-Hernandez, 2010 WL 4509754 (BIA Oct. 22, 2010) (unpublished decision)] reversed a denial of voluntary departure where the petitioner's lack of family ties in the United States, non-payment of taxes, failure to maintain employment, and responsibility for causing a car accident by running a stop sign were outweighed by his having entered the United States as a child, grown up here, and his age of '19 years old at the time of the hearing.'" (Appellant's Reply Brief at 14 (quoting Maldonado-Herandez, 2010 WL 4509754, at *2).) However, the BIA also observed that the alien "entered the United States when he was only 9 years old and has lived in the United States for approximately 10 years." Maldonado-Hernandez, 2010 WL 4509754, at *2. The alien also did not have a criminal record in the United States. Id. Likewise, the BIA briefly observed in In re Benitez Marban, 2015 WL 799767 (BIA Jan. 20, 2015) (unpublished decision), that, "[w]hile the pendency of criminal charges is a serious adverse factor," the alien had resided in this country "for many years" and had family ties to the United States, id. at *1.

10