139 F.3d 902
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
United States of America, Plaintiff-Appellee,
v.
Juan PEREA-REAL, Defendant-Appellant.
 No. 96-2689.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 6, 1998.
Decided Mar. 3, 1998.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 95 CR 431 Ruben Castillo, Judge.
 Before Hon. RICHARD A. POSNER, Hon. FRANK H. EASTERBROOK, Hon. TERENCE T. EVANS, Circuit Judges.
 
 ORDER
 
 1
 Juan Perea-Real, who was born in Mexico but has lived in the United States since the Kennedy administration, was released from an Illinois prison and deported to Mexico from El Paso, Texas, on June 5, 1992. He was told at the time that he would face criminal prosecution if he returned to the USA without first receiving permission to do so from the Attorney General. The admonition was received like water off a duck's back, because Perea slipped back across the border the very next day. Less than a year later he was arrested and charged with robbery in Chicago. He was convicted and sentenced on the robbery charge in an Illinois court, and eventually he was charged in federal court (in 1995) with violating 8 U.S.C. § 1326(a) for being a deported alien who reentered the United States without the consent of the Attorney General. He was convicted on the charge in 1996--via a conditional guilty plea that reserved his right to appeal the denial of a motion to dismiss--and sentenced to serve a term of 5 years in prison.
 
 
 2
 In 1985 Perea was arrested and convicted in connection with the stabbing death of a man in Chicago. The charge was voluntary manslaughter, for which he was sentenced to a term of 15 years in prison. On August 18, 1986, Perea was convicted of separate state charges of unlawful use of a weapon and aggravated battery.
 
 
 3
 Perea suggests, for the first time on appeal adds the government, that the record is confusing on the nature of the weapons charge to which he pled guilty in state court in 1986. This is so, he says, because two guns--a sawed-off shotgun and a revolver--were involved in the 1986 state case and he's not certain which charge (or which gun, actually) he admitted possessing. As to whether this gun identity claim is a new claim, we think the government is correct; it is a new argument not raised in the motion to dismiss that preceded his guilty plea in the district court. So the argument is waived, although we note that it is without legs to begin with. The Illinois indictment charged, in count 2, that Perea knowingly possessed a sawed-off shotgun in violation of chapter 38, section 24-1-A-(7) of the state code. That was the charge he plainly pled to, and at his 1988 deportation hearing he admitted that this was so.
 
 
 4
 The Immigration and Naturalization Service (INS) got wind of Perea's convictions and some earlier ones, including a 1978 rap for aggravated battery, so it sent him an order to show cause why he should not be deported. The show cause order listed two separate grounds for deportation--8 U.S.C. § 1251(a)(4)[1] ("convicted of two crimes involving moral turpitude") for the manslaughter and 1978 aggravated battery convictions, and 8 U.S.C. § 1251(a)(14) ("convicted of possessing or carrying ... a weapon commonly called a sawed-off shotgun") for the 1986 unlawful use of a weapon conviction.
 
 
 5
 Perea's deportation hearing was held at Menard Correctional Center in southern Illinois. At the hearing the immigration judge (IJ) questioned Perea, who appeared pro se, about the three criminal convictions noted in the show cause order. Perea admitted to a March 31, 1978, conviction for aggravated battery, an April 11, 1986, conviction for manslaughter, and the August 18, 1986, unlawful use of weapon conviction involving, as we have said, the sawed-off shotgun. Thereafter, after ascertaining that the convictions were final, the IJ found Perea deportable because he committed crimes of "moral turpitude" and also because he possessed a sawed-off shotgun. The IJ told Perea he could appeal the deportation order and Perea said that was what he wanted to do. The tape recording of the hearing has the IJ saying, "All right, I'll indicate that you wish to appeal the decision. You have 10 days to file a notice of appeal. I'll give you the forms before you leave today." Perea says he never received the "forms," and although the government is apparently unwilling to accept Perea's representation that he didn't, everyone agrees on one thing--no appeal was taken. Perea was deported 4 years later after finishing his state sentence.
 
 
 6
 Perea's motion to dismiss the 1995 indictment rested on claims that he was denied his right to appellate review of the deportation order and that the 1988 administrative hearing itself was fundamentally unfair. The district judge denied the motion, reasoning that Perea could not satisfy the two-pronged test we established in United States v. Espinoza-Farlo, 34 F.3d 469 (7th Cir.1994). Today we consider Perea's appeal.
 
 
 7
 In United States v. Mendoza-Lopez, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), the Supreme Court held that a defendant prosecuted under 8 U.S.C. § 1326 for illegal entry into the USA following deportation may collaterally attack the deportation order underlying his criminal offense "where the deportation proceeding effectively eliminates the right to judicial review." Id. at 839. In Mendoza the defendant was involved in a "group deportation hearing" with 11 other Mexican nationals. The Supreme Court found that in addressing all of the aliens at the same time, the immigration judge failed to adequately inform each of their rights to apply for suspension of deportation or to appeal. Id. at 832-833. The Supreme Court held further that the "deportation proceeding in which these events occurred may not be used to support a criminal conviction." Id. at 842. What the Supreme Court did not do in Mendoza, however, was decide whether, in addition to deprivation of judicial review, a defendant had to also show that the deportation hearing resulted in fundamental unfairness to him in order to get relief. Id. at 838 n. 17. We addressed that very question and answered it in the affirmative in Espinoza-Farlo.
 
 
 8
 Under Espinoza-Farlo, to prevent an underlying deportation order from being used to prove an element of a criminal offense (like here, a violation of 8 § 1326(a)), we held that a defendant must show (1) that the deportation hearing effectively foreclosed his right to direct judicial review, and (2) that the deportation hearing was fundamentally unfair; i.e., that he was prejudiced by the IJ's failure to inform him of his appellate rights or his right to seek a suspension of deportation, because an exercise of those rights would have yielded relief from deportation. Id. at 471.
 
 
 9
 Perea asserts that he did not receive forms for filing an appeal, which "made an appeal virtually impossible." Even if we were to accept this self-serving, unsupported assertion, that alone would not satisfy the first prong of the Espinoza-Farlo test because the requirement is that the defendant be advised of his right to appeal, not that forms be provided by the INS. Espinoza-Farlo, 34 F.3d at 471.
 
 
 10
 Here, Perea concedes that the IJ advised him of his appellate rights. He does not assert, as was the case in Mendoza, that he did not understand his review rights. Perea was not involved in the sort of "group hearing" which was the case in Mendoza. Although other hearings may have been held at the prison facility on August 11, 1988, each was held separate and apart from the other. There is nothing here that would suggest to us, as could be the case in a group hearing, that the IJ's appellate advice slipped past Perea without taking hold. Accordingly, the procedure followed by the IJ satisfied the requirements of Espinoza-Farlo.[2]
 
 
 11
 More importantly, having been informed of his right to appeal, and notwithstanding that he was not removed from the country until 1992--four years after the deportation order issued--Perea took no steps to either appeal or request review of any kind of the order that sent him away. Also, after being deported, rather than apply for readmission through legal channels, Perea instead knowingly reentered the United States illegally the next day. The latter act makes it difficult to drum up too much sympathy for Perea's predicament.
 
 
 12
 Unlike the multiple defendants in Mendoza who were deported shortly after their group hearing, Perea was adequately advised of his right to appeal, and he was told he had 10 days to file. He did nothing for 4 years. Accordingly, we cannot find that judicial review of the 1988 deportation hearing was foreclosed, and Perea, accordingly, fails to meet the first of the two prongs established in Espinoza-Farlo. And had Perea somehow or other got over the first hurdle, the second would have clearly tripped him up, for we are unable to envision any scenarios where relief on appeal would have been available to him.
 
 
 13
 AFFIRMED.
 
 
 
 [1]
 Many of the sections of Title 8 have been renumbered. We refer to the section number in effect at the time the events in this case were occurring
 
 
 [2]
 Additionally, the IJ (a) informed Perea of his right to counsel; (b) specifically ascertained that he would proceed pro se; (c) specifically advised him of his right to appeal the deportation decision; and (d) required Perea to indicate on the record that he wanted to appeal the decision. These were elements that we indicated would be significant in finding that direct judicial review had not been foreclosed. See Espinoza-Farlo, 34 F.3d at 471 n. 3