### UNITED STATES of America, Plaintiff,

v.

### David Rafael ANDERSON, Defendant.

### No. IP 99–30 CR–01 B/F.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 24, 1999.

---

Donna R. Eide, Assistant U.S. Attorney, Indianapolis, IN, for plaintiff.

Jim McKinley, Federal Community Defenders Office, Indianapolis, IN, for defendant.

### *ENTRY DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT*

BARKER, Chief Judge.

Defendant, David R. Anderson ("Anderson"), has been indicted on the charge that as a deported alien he unlawfully entered the United States in violation of 8 U.S.C. § 1326. Anderson seeks to collaterally attack his prior two deportation orders, moving this Court to dismiss the Indictment on the grounds that he allegedly failed to receive adequate judicial review of his prior deportations orders, which was and is a violation of his Fifth Amendment right to due process. The United States of America ("the government") rejoins that Anderson received all the process to which he was constitutionally entitled in his previous deportation hearings and that those proceedings were fundamentally fair. For the reasons discussed below, we *DENY* Anderson's motion to dismiss the Indictment.

*Background*

Defendant Anderson was born in Honduras in 1956. He entered the United States as a legal permanent resident in November 1964, dropped out of school in the early seventies and "led a life of juvenile delinquency" from 1971 to 1982. Gov't Ex. 4 (IJ decision, Oct. 22, 1990, at 3). In 1982, Anderson was convicted in Louisiana on charges of armed robbery and attempt-

ed murder, receiving two concurrent twelve-year sentences of imprisonment in Louisiana State Prison. *See* Gov't Ex. 5 (BIA decision, Nov. 29, 1993, at 2). On a separate occasion in 1982, Anderson also was convicted of simple robbery and sentenced to a seven-year term of imprisonment. *Id.*

On July 14, 1989, approximately two weeks before the Louisiana State Prison was to discharge Anderson from custody, the Immigration and Naturalization Service ("INS") commenced deportation proceedings against Anderson by issuing him a Notice of Deportability. *See* Parties' Factual Stipulation ("Stip.") ¶ 5. A deportation hearing commenced in August 1989, was continued twice, and ultimately concluded on October 22, 1990. *Id.* ¶ 7. Counsel represented Anderson at all stages of the deportation proceedings. *Id.* ¶ 6.

At the deportation hearing, Anderson conceded that he was deportable. *Id.* ¶ 8. However, he sought a discretionary "waiver of inadmissibility" under section 212(c) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1182(c), which at that time permitted the Attorney General (or her delegate), to exercise discretion to afford an excludable alien relief from deportation based on equity and special circumstances. *Id.* On October 22, 1990, Immigration Judge McHugh ("IJ") granted Anderson the requested relief from deportation under section 212(c), finding, among other things, that Anderson's long period of lawful residence in the United States from a young age, extensive family ties, coupled with the effect that his deportation would have on the emotional problems of his sons and the serious illnesses of both his parents, created unusual and outstanding equities that offset his criminal record. *See* Gov't Ex. 4; Stip. ¶ 9.

The INS appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), which reversed the IJ's decision on November 29, 1993, and ordered Anderson's deportation. *See* Gov't Ex. 5. The BIA conducted a *de novo* review of the IJ's findings and concluded that Anderson's circumstances did "not merit section 212(c) relief in the exercise of discretion." *Id.* at 4. The BIA agreed with the IJ that outstanding equities characterized Anderson's case, but found those equities outweighed by serious adverse factors and evidence of Anderson's undesirability as a lawful permanent resident. *Id.* at 5. The BIA initially noted that Anderson's deportability, which he failed to contest, had been established by clear, unequivocal, and convincing evidence. *Id.* at 2. In comparing the equities and Anderson's history of criminal activity, the BIA found that Anderson had a twenty-year history of drug abuse, that at least sixteen of his twenty-nine years in the United States were spent either committing crimes or serving time in prison for those crimes, and that the IJ erroneously characterized the majority of these crimes as having occurred during Anderson's juvenile years, when in fact he committed the most serious crimes after the age of twenty-one. *Id.* at 4–5. The BIA also assessed Anderson's family history, such as his failure to provide child support for his children, and his potential for rehabilitation, concluding that the balance of the relevant factors required the denial of discretionary relief. In a brief dissent, Lawrence DiCostanzo, temporary BIA member, believed that the IJ properly exercised his discretion in awarding Anderson relief from deportation.

On December 14, 1993, Anderson's counsel filed a Petition for Judicial Review of the BIA decision with the Court of Appeals for the Fifth Circuit. *See* Stip. ¶ 12. On or about February 17, 1994, INS authorities arrested Anderson pursuant to the BIA's November 1993 deportation order and detained him in Orleans Parish Prison pending deportation. *Id.* ¶ 13. Anderson's Petition for Judicial Review of the BIA decision remained pending, with Anderson scheduled to file his brief in support thereof sometime in early March 1994. On February 17, 1994, Anderson's counsel moved the Fifth Circuit to stay

Anderson's deportation, filing a "Motion for Emergency Confirmation of Stay of Deportation." *Id.* ¶ 14. That same day, according to the parties and the Fifth Circuit's docket sheet, the INS opposed the motion and the Fifth Circuit denied Anderson's request to stay deportation. *See* Gov't Ex. 6; Stip. ¶ 15. On February 22, 1994, INS deported Anderson to Honduras.

On February 28, 1994, INS moved the Fifth Circuit to dismiss Anderson's Petition for Judicial Review of the BIA decision on the grounds that Anderson had departed the country, asserting that the Fifth Circuit lacked subject matter jurisdiction to hear the dispute under 8 U.S.C. § 1105a(c) (since repealed and recodified). *See* Stip. ¶ 17. On March 8, 1994, Anderson's counsel filed his Brief for Appellant with the Fifth Circuit, asserting, among other things, that the BIA decision regarding Anderson's deportation was arbitrary, capricious, and an abuse of the BIA's discretion. On March 22, 1994, the Fifth Circuit granted INS' motion to dismiss Anderson's Petition for Judicial Review of the BIA decision on jurisdictional grounds. *Id.* ¶ 19.

Undeterred by his deportation, Anderson reentered the United States no later than March 1995 without inspection or permission by immigration authorities or the Attorney General. Prior to returning to the United States, Anderson did not otherwise legally challenge the Fifth Circuit's decisions to deny his request for an emergency stay and to dismiss his petition for judicial review of the BIA's decision. Instead, Anderson obtained a social security card from an unknown source, visited the Louisiana Division of Motor Vehicles, and falsely represented in an application for a Louisiana identification card that the Social Security Administration had assigned him the social security number. *See* Gov't Ex. 10 (Gov't Bill of Information). He also falsely represented that his name was Jackie D. Smith, a ploy that nicely complimented his new social security number—Anderson (a.k.a.Smith) received his identification card and tempo-

rarily avoided detection by immigration authorities.

Anderson's run of luck, however, was short-lived. On May 12, 1995, United States Border Patrol agents encountered Anderson at a residence in Louisiana after learning from an informant that Anderson had reentered the country without authorization. They discovered a number of false documents in Anderson's possession, including his fraudulently-obtained identification card. *Id.* In June 1995, a federal grand jury sitting in the United States District Court for the Middle District of Louisiana indicted Anderson on the charge of unlawful entry following deportation, in violation of 8 U.S.C. § 1326. The government dismissed the section 1326 violation in exchange for Anderson's plea of guilty to unlawful use of social security number in violation of 42 U.S.C. § 408(a)(7)(B). *Id.* (Grand Jury Indictment). On November 3, 1995, Anderson received a twelve-month sentence of imprisonment pursuant to the plea agreement. *See* Gov't Ex. 11; Stip. ¶ 22

On October 21, 1996, the INS instituted deportation proceedings against Anderson for the second time with the same result. The INS' allegations supporting deportability included, among other things, Anderson's previous convictions for attempted murder, armed robbery, and simple robbery. *See* Gov't Exs. 11–12. On March 25, 1997, an IJ ordered Anderson's deportation, stating in is order that "Respondent has made no application for relief from the deportation" and that Anderson "WAIVED" appeal. Gov't Ex. 14. Anderson agrees that he declined to appeal the IJ's deportation decision. *See* Gov't Ex. 14; Stip. ¶ 24. On April 8, 1997, the INS deported Anderson pursuant to a deportation warrant issued on March 28, 1997. Anderson's notice of deportation, which he signed in the presence of a witness, advised him (in both Spanish and English) that "[s]hould you wish to return to the United States you must write this office or the United States Consular Office

nearest your residence abroad as to how to obtain permission to return after deportation." Gov't Ex. 15. The document further warned that "[p]ermission must be obtained from the Attorney General if you are seeking admission within five (5) years of deportation or removal" and that reentry without such permission would result in imprisonment for up to fifteen years. *Id.*

Despite these explicit warnings, two prior deportations, and four criminal convictions, Anderson again reentered the United States, although this time he headed for Indiana instead of remaining in Louisiana. Unfortunately for Anderson, Indiana authorities were no less diligent than their southern counterparts, locating Anderson in Shelby County on November 4, 1998. Like his previous illegal entry, Anderson conducted his affairs under a non-descript alias—Larry Stevens.

On March 24, 1999, a grand jury in this judicial district returned an Indictment charging Anderson with unlawful reentry into the United States following two prior deportations, in violation of 8 U.S.C. § 1326(a),(b)(2). Anderson now moves to dismiss the Indictment, contending in a collateral attack on his two prior deportation proceedings that he failed to receive judicial review of those deportation orders and that a criminal conviction predicated upon them therefore would violate his Fifth Amendment due process rights. The government responds that Anderson received all the process he was due and that the prior deportation proceedings were fundamentally fair in any event. We pro-

ceed to consider the legal merits of the parties' contentions.

### Discussion

The grand jury indicted Anderson on charges of violating 8 U.S.C. § 1326(a), which provides:

[A]ny alien who—

(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States ... shall be fined under Title 18, or imprisoned not more than 2 years, or both.[1]

Anderson moves to dismiss the Indictment on the grounds that he was denied judicial review of his first deportation proceedings[2] in violation of his Fifth Amendment due process rights. Anderson does not contend that the first deportation hearings themselves contained some procedural defect, such as his misapprehension of the nature of the proceedings or some violation of his right to counsel. Rather, he contends that since the Fifth Circuit denied his request for a stay of the BIA's deportation order, the Fifth Circuit also denied him judicial review of the BIA's decision when it dismissed his appeal on jurisdictional grounds after his deportation. Therefore, Anderson's argument continues, the civil deportation order cannot be used as an element of the criminal offense of illegal reentry by an alien after deportation. Anderson concludes that his second deportation also cannot form the

---

1. The statute excepts those aliens who have either received the express consent of the Attorney General to reapply for admission or who otherwise establish that they were not required to obtain such consent. *See* 8 U.S.C. §§ 1326(a)(2)(A), (B). Anderson does not contend that either provision applies to this case. Overall, the government must demonstrate the following three elements beyond a reasonable doubt to obtain a conviction under section 1326(a): the defendant (1) is an alien, (2) was previous deported, and (3) has reentered the United States without proper per-

mission. *See United States v. Gomez–Orozco*, 188 F.3d 422, 423 (7th Cir.1999).

2. By "first" deportation proceedings, we mean those events leading to Anderson's first deportation on February 22, 1994, such as the IJ's October 1990 hearing and the BIA's order of deportation on November 29, 1993. Likewise, we refer to the events leading to Anderson's April 8, 1997, deportation as the "second" deportation proceedings, which include the INS' October 1996 initiation of proceedings and the IJ's March 25, 1997, deportation order.

basis of this criminal offense because but for his first deportation, he never would have reentered the country illegally and committed additional crimes. We agree with Anderson that he may collaterally attack his prior civil deportation order in this criminal proceeding, but we find his contentions without merit for the reasons explained below.

█ The Supreme Court has held that a defendant prosecuted under 8 U.S.C. § 1326 may collaterally attack the prior deportation order upon which the criminal charge is predicated if procedural errors in that prior deportation hearing deprived the alien of judicial review. *See United States v. Mendoza–Lopez,* 481 U.S. 828, 837–40, n. 17, 107 S.Ct. 2148,. 2155–56, 95 L.Ed.2d 772 (1987). In *Mendoza–Lopez,* the defendants were arrested in the United States less than two months after deportation and charged with illegal entry following deportation. The defendants attempted to collaterally challenge their prior deportation orders, contending that they failed to understand the IJ's explanation of deportation suspension, and that they therefore did not knowingly and intelligently waive their rights to appeal and to apply for deportation suspension. *See Mendoza–Lopez,* 481 U.S. at 831–32, 107 S.Ct. at 2151–52.

The government conceded in that case both that the defendants failed to understand the deportation proceedings and that the proceedings were "fundamentally unfair" and violative of due process. However, it contended that absolutely no due process limitations constrained enforcement of section 1326, and that the defendants consequently could not mount a collateral attack on their previous deportations. The Supreme Court disagreed, finding that because the defendants did not knowingly and intelligently waive their right to appeal the deportation order, this procedural defect in the deportation proceedings deprived them of judicial review of those proceedings. Hence, the Court held that the government could not rely on the deportation orders as reliable proof of

an element of a criminal offense. *See Mendoza–Lopez,* 481 U.S. at 840, 107 S.Ct. at 2156. The Court explained:

That Congress did not intend the validity of the deportation order to be contestable in a § 1326 prosecution does not end our inquiry. If the statute envisions that a court may impose a criminal penalty for reentry after any deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been, the statute does not comport with the constitutional requirement of due process.

Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding. This principle means at the very least where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense. The result of those proceedings may subsequently be used to convert the misdemeanor of unlawful entry into the felony of unlawful entry after a deportation. Depriving an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense.

*Mendoza–Lopez,* 481 U.S. at 837–39, 107 S.Ct. at 2154–55 (citations and footnotes omitted).

The Seventh Circuit has interpreted the *Mendoza–Lopez* decision as establishing a two-step analysis for determining whether a defendant can successfully prevent his prior deportation from being used as a basis for a subsequent section 1326 conviction:

We hold that for a section 1326 defendant to successfully prevent his underly-

ing deportation from being used to prove an element of a criminal offense, the defendant must first show that the deportation hearing effectively foreclosed his right to direct judicial review of the deportation order. Second, he must show that the deportation hearing was fundamentally unfair.... If he cannot make either one of these showings, the deportation order may be use to establish an element of a criminal offense. *United States v. Espinoza–Farlo*, 34 F.3d 469, 471 (7th Cir.1994) (joining the Second, Fifth, Eighth, Ninth, Tenth and Eleventh Circuits in requiring defendant to prove both fundamental unfairness and foreclosure of judicial review; finding it irrelevant in that case whether the defendant's alleged failure to understand his right to appeal foreclosed judicial review because he failed to prove that the alleged procedural defect in the deportation proceedings was fundamentally unfair and therefore prejudicial); *see* 8 U.S.C. § 1326(d) (codifying the *Mendoza–Lopez* holding).

The section 1326 charge in this case rests upon both Anderson's 1994 and 1996 deportations, and since either could sustain a conviction for illegal reentry, Anderson must succeed in collaterally attacking each deportation before dismissal of the Indictment is warranted. Thus, we proceed to apply the lessons of *Mendoza–Lopez* and its progeny to each deportation in turn.

First we ask, has Anderson demonstrated that some procedural defect in the proceedings leading to his 1994 deportation resulted in fundamental unfairness and foreclosed judicial review? We think not. As for fundamental unfairness, the record demonstrates, and Anderson fails to assert otherwise, that he received all the process he was due during his administrative proceedings before the IJ and BIA. Counsel represented Anderson at all stages of the proceedings, he received notice and an opportunity to be heard at a full-fledged evidentiary hearing, and he apparently understood and exercised his procedural rights. We do not have before us the typical case of a collateral attack on a prior deportation order where some alleged procedural defect in the actual administrative proceedings allegedly caused prejudicial harm and foreclosed judicial review. Hence, Anderson has not alleged a deprivation of his right to counsel during the INS proceedings, *see e.g., United States v. Loaisiga*, 104 F.3d 484, 485 (1st Cir.1997), that the IJ failed to inform him of deportation alternatives, *see e.g., United States v. Martinez–Gonzales*, No. 90–1382, 1990 WL 157041, at *2 (7th Cir.1990), or that the IJ failed to inform him of his right to appeal, *see e.g., United States v. Fares*, 978 F.2d 52, 54 (2d Cir.1992). In short, the process provided to Anderson during his actual deportation hearings did not prejudice him in any respect.

█ Anderson's real quarrel pivots on the Fifth Circuit's decision to deny his request for a stay of his deportation pending its final review of the BIA's deportation order. In order to carry his burden of demonstrating fundamental unfairness, Anderson must advance some argument (we will assume for the moment that the denial of stay foreclosed direct judicial review of the deportation order, *infra*) for why the Fifth Circuit might have reversed the BIA's decision and granted Anderson discretionary relief from deportation. *See United States v. Perea–Real*, No. 96–2689, 1998 WL 108462, at *3 (7th Cir. Mar.3, 1998) (holding that section 1326 defendant failed to demonstrate fundamental unfairness from failing to appeal deportation decision because the court was "unable to envision any scenarios" where relief on appeal would have been available); *Espinoza–Farlo*, 34 F.3d at 471 (finding that section 1326 defendant convicted of an aggravated felony failed to demonstrate prejudice in the prior deportation proceedings because he stood no chance of winning an appeal); *Martinez–Gonzales*, 1990 WL 157041, at *2 (finding that section 1326 defendant did not show prejudice from claimed procedural errors in his deportation hearing and recognizing other authority requiring that the defendant show that the errors "might have affected the outcome of the hearing") (*quoting United States v. Holland*, 876 F.2d 1533, 1536

(11th Cir.1989)); *United States v. Benitez–Villafuerte*, 186 F.3d 651, 658 (5th Cir. 1999) ("A showing of prejudice means there was a reasonable likelihood that but for the errors complained of the defendant would not have been deported.") (internal quotations and citations omitted). Anderson has neither made such a showing nor analyzed the Fifth Circuit's decision to deny his request for a stay.

Anderson's sole argument for reversal of the BIA's decision is that the IJ and the dissenting BIA judge would have afforded Anderson discretionary relief from deportation. Aside from this passing comment, Anderson does not provide any analysis whatsoever explaining why the Fifth Circuit may have afforded Anderson the discretionary relief from deportation that he requested. Instead, Anderson simply attaches to his Reply memorandum his Fifth Circuit brief challenging the BIA decision and states: "[g]iven the factors cited in [the IJ's] original decision and those set forth in Mr. Anderson's brief to the Fifth Circuit, there can be no question that Mr. Anderson was prejudiced" by the Fifth Circuit's alleged failure to fully review the BIA decision. Def.'s Reply at 8. Anderson apparently expects this Court to conduct an independent review of his Fifth Circuit brief and the IJ's decision (which, incidentally, we have done), extract the arguments most favorable to his position in this litigation, view them through the lens of "fundamental unfairness," and ultimately find that Anderson carried *his burden* to establish the requisite prejudice to undermine his prior deportation order. Anderson erroneously has presumed that

we would assume the reigns of advocacy on his behalf. If grounds exist on which to argue that the BIA's decision was incorrect, he has neither raised nor analyzed them in his briefing. Without at least some development of the issue, Anderson fails to advance a plausible argument that his appeal of the BIA's deportation decision may have succeeded.

While Anderson's inadequate effort to establish prejudice alone justifies the use of his first deportation to establish an element of the section 1326 offense, we are compelled to take a further step in assessing the alleged fundamental unfairness in the Fifth Circuit's refusal to stay Anderson's deportation and fully review the BIA's decision. Anderson virtually ignores the Fifth Circuit's denial of Anderson's request for a stay, a critical omission when one considers that the denial of the stay provides invaluable insight into the Fifth Circuit's perspective on Anderson's appeal.[3]

Prior to 1990, Anderson would have received an automatic stay of deportation upon filing his petition for review of the BIA's decision with the Fifth Circuit. *See Zegarski v. INS*, 965 F.2d 426, 427 (7th Cir.1992) (per curium). In 1990, however, Congress passed the Immigration Act of 1990, which, in part, amended the INA and eliminated the automatic stay for aliens who had been convicted of "aggravated felonies," a category into which Anderson's 1982 convictions squarely fell. *Id.; see* 8 U.S.C. § 1105a(a)(3)[4]; 8 U.S.C. § 1101(a)(43). Both the Fifth and Seventh Circuits subsequently have held that an

---

3. We are left to speculate about the rationale for the Fifth Circuit's denial of the stay because defendant fails to provide us with any other information regarding that decision save for that Court's docket entry confirming the stay denial. This short-coming provides a further example of Anderson's minimal attention to establishing that the Fifth Circuit plausibly would have reversed the BIA's deportation decision.

4. During the relevant time period, 8 U.S.C. § 1105a(a)(3) read:

The service of the petition for review … shall stay the deportation of the alien pending determination of the petition by the court, unless the court otherwise directs or unless the alien is convicted of an aggravated felony, in which case the Service shall not stay the deportation of the alien pending determination of the petition unless the court otherwise directs.

*See Zegarski*, 965 F.2d at 426, n. 1. We further note that a significant portion of the statutes regulating immigration matters have been amended or recodified, typically more than once, since 1990. We confine our discussion

alien convicted of an aggravated felony is precluded from obtaining an automatic stay of deportation regardless of the date of conviction. *Id; Ignacio v. INS,* 955 F.2d 295, 298 (5th Cir.1992). Moreover, an alien convicted of an aggravated felony is "conclusively presumed to be deportable from the United States." *Espinoza–Farlo,* 34 F.3d at 471 (*quoting* 8 U.S.C. § 1252a(c) (1994), now codified at § 1228(c)); *Benitez–Villafuerte,* 186 F.3d 651, 658.

Since Anderson was not entitled to an automatic stay of his deportation pending review of the BIA decision, his one hope rested with the Fifth Circuit's granting him a discretionary stay of deportation.[5] The Fifth Circuit, like the Seventh Circuit, likens a request for a judicial stay of deportation to request for injunctive relief, requiring the movant for a discretionary stay to show: (1) a likelihood of success on the merits; (2) that irreparable harm would occur if a stay is not granted; (3) that the potential harm to the movant outweighs the harm to the opposing party if a stay is not granted; and (4) that the granting of the stay would serve the public interest. *See Lucacela v. Reno,* 161 F.3d 1055, 1058 (7th Cir.1998); *Ignacio v. INS,* 955 F.2d at 299, n. 5. Without belaboring

the point, the Fifth Circuit denied Anderson's stay request, necessarily finding that the merits of Anderson's appeal, if any, failed to tip the scale of equity in his direction. The fact that some equities weighed in his favor, such as immediate deportation that likely would moot his appeal, an inadequate remedy at law, and the harm incurred by separation from this family, bespeaks the weakness of the merits of his appeal. *See Sofinet v. Immigration and Naturalization Service,* 188 F.3d 703, 708 (7th Cir.1999).

From an objective standpoint, it also strikes us as understandable that the Fifth Circuit denied Anderson's stay request. The BIA exercised its *de novo* power of review of the IJ's decision, which effectively meant that the Fifth Circuit would have disregarded the IJ's legal and factual conclusions on appeal. *See, e.g., Gomez–Mejia,* 56 F.3d 700, 702 (5th Cir.1995) ("We have authority to review the decision of the BIA after its *de novo review,* but we do not review the decision of the IJ."); *Balazoski v. INS,* 932 F.2d 638, 640 (7th Cir.1991) ("Whether the IJ used the incorrect legal standard, however, is irrelevant. We review the decision of the BIA, not the IJ."); *Paredes–Urrestarazu v. INS,* 36 F.3d 801, 807 (9th Cir.1994) (holding that

---

to the version of the statute controlling our decision, but we have provided some references to present codifications.

This particular provision of the law has been modified significantly by the Illegal Immigration Reform and Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104– 208, 110 Stat. 3009. For example, under the transitional rules established by IIRIRA for judicial review of cases of aliens who were placed in deportation proceedings before April 1, 1997, and whose final orders of deportation were entered more than 30 days after the date of enactment of IIRIRA (after October 30, 1996), the presumption with respect to stays pending appellate review essentially has been reversed, regardless of whether the alien has been convicted of an aggravated felony. Section 309(c)(4)(F) of IIRIRA states that "service of the petition for review shall not stay the deportation of an alien pending the court's decision on the petition, unless the court orders otherwise...." 110 Stat. at 3009–626. *See Sofinet v. INS,* 188 F.3d 703,

704 (7th Cir.1999); *Lucacela v. Reno,* 161 F.3d 1055, 1058 (7th Cir.1998). Interestingly, neither party considers whether the transitional rules govern Anderson's second deportation, which the IJ ordered on March 25, 1997. The matter is of no import for purposes of our decision, however, because Anderson's refusal to appeal the IJ's 1997 order effectively moots any issues pertaining to a putative stay or judicial review of that order.

5. We take pause to emphasize that the Fifth Circuit's decision to deny Anderson's request for a discretionary stay of deportation proceedings is, of course, distinct from the issue of whether the BIA properly exercised its discretion in finding that Anderson did not qualify for relief from deportation under section 212(c). The Fifth Circuit's denial of the stay may have depended in part on whether the BIA abused its discretion, but the two concepts significantly differ in our following discussion.

"in cases such as this, in which the [BIA] has exercised it power to conduct a *de novo* review of the IJ's decision, we review only the decision of the BIA"). Put another way, we find no merit in Anderson's argument that the Fifth Circuit would have reversed the BIA's decision partly because the IJ believed that Anderson should receive discretionary relief from deportation.

Furthermore, the deferential standard of review the Fifth Circuit would have afforded the BIA's decision, in conjunction with the inherently discretionary nature of the deportation relief requested, significantly stacked the odds against Anderson's prevailing on appeal even if the Fifth Circuit had stayed deportation. *See Eyoum v. INS*, 125 F.3d 889, 891 (5th Cir.1997) ("We will affirm an order of deportation issued by the BIA if supported by reasonable, substantial and probative evidence on the record considered as a whole."); *Campos–Guardado v. INS*, 809 F.2d 285, 289 (5th Cir.1987) ("Our review ... [of the

BIA's decision] is limited. The Supreme Court has noted that an administrator such as the Attorney General has considerable discretion in interpreting and implementing the statutory provision of the Immigration and Naturalization Act."). Indeed, both the IJ and the BIA found that Anderson had been convicted of crimes involving moral turpitude and that his deportability had been established by clear and convincing evidence. The only question that remained pertained to whether the Attorney General (acting through its delegate, the INS) would exercise its Congressionally delegated authority to grant Anderson discretionary relief from deportation under section 212(c).[6] The Supreme Court has described the Attorney General's discretionary power to suspend deportation as an "act of grace" that, like a Presidential pardon, is extended in "unfettered discretion." *See INS v. Yang*, 519 U.S. 26, 30, 117 S.Ct. 350, 352–53, 136 L.Ed.2d 288 (1996); *Yang v. INS*, 109 F.3d 1185, 1197 (7th Cir.1997).[7] The

6. In 1990, section 212(c) allowed an alien convicted of an aggravated felony, who otherwise would be deported, to request that the Attorney General exercise her discretion to allow the alien to remain in the country. *See Cortes–Castillo v. INS*, 997 F.2d 1199, 1202 (7th Cir.1993); 8 U.S.C. § 1182(c). However, Congress amended the Immigration and Nationality Act, effective November 29, 1990, by enacting the Immigration Act of 1990, which eliminated discretionary relief for aliens convicted of aggravated felonies who served for such felony or felonies a term of imprisonment of at least five. *See* 8 U.S.C. § 1182(c) (1994). While the amendments may not affect Anderson's first deportation since he apparently applied for discretionary relief under section 212(c) just prior to their effective date, the 1990 changes foreclosed any attempt for Anderson to request discretionary relief for his second 1997 deportation. We also note that in 1996, Congress repealed section 212(c) entirely and replaced it with a new but similar section, § 240A(b), 8 U.S.C. § 1229b(b), which continued to vest the Attorney General with the discretion to waive deportation because of the extraordinary hardship to the deportee or his family, or due to other exceptional circumstances. *See LaGuerre*, 164 F.3d at 1037. The 1996 amendments continued to bar discretionary relief from deportation for any alien convicted of

aggravated felonies, in addition to precluding such relief for aliens convicted of a variety of other crimes, such as those crimes involving "moral turpitude" or falsification of certain documents. *See* 8 U.S.C. § 1229b(b), § 1227(a)(2), (3).

7. Congress has significantly curtailed judicial review of the Attorney General's deportation decisions since Anderson's 1994 deportation. *See Singh v. Reno*, 182 F.3d 504, 507–09 (7th Cir.1999). As we have mentioned previously, in 1996, Congress amended the Immigration and Nationality Act (redesignated INA § 237(a)(2)(A)(i), 8 U.S.C. § 1227(a)(2)(A)(i)), by passing both the Antiterrorism and Effective Death Penalty Act ("AEDPA") and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA" *supra*, n. 4), which took effect on April 1, 1997. *Id.* The AEDPA § 440(a) amended INA § 106 to provide that "any final order of deportation against an alien who is deportable by reason of having committed a [covered] criminal offense ... shall not be subject to review by any court." 8 U.S.C. S 1105a(a)(10) (repealed by IIRIRA, now *see* 8 U.S.C. § 1252(a)(2)(C)). The IIRIRA § 306(f)(1)(g) eliminated judicial review of the Attorney General's discretionary decisions to "commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C.

BIA, after fully considering a litany of relevant factors, such as Anderson's personal circumstances and past criminal record, chose not to exercise its statutorily conferred discretion to suspend his deportation, a conclusion that Anderson would have been hard-pressed to challenge on appeal:

> Our review of the [BIA's] denial of a section 212(c) waiver is even more limited. Section 212(c) makes a waiver of excludability (hence, deportation) available "in the discretion of the Attorney General." Because section 212(c) does not provide for standards governing how the [BIA's] discretion should be exercised, the Attorney General has unusually broad discretion in granting and denying waivers. We limit our review to whether denial of a waiver was "arbitrary, irrational, or contrary to law."

*Molenda v. INS*, 998 F.2d 291, 293–94 (5th Cir.1993) (citations omitted).

The Fifth Circuit's refusal to stay deportation pending its full review of that decision merely underscores our independent conclusion that Anderson has failed to come forward with any substantive argument for why the Fifth Circuit plausibly would have reversed the BIA's discretionary decision to order his deportation. Therefore, Anderson has not demonstrated the degree of prejudice necessary for us to find that his prior deportation proceedings were fundamentally unfair under the first step of the *Espinoza–Farlo* analysis. Accordingly, we conclude that Anderson's 1994 deportation properly forms the basis for the section 1326 offense as charged in the Indictment.

In addition to fundamental unfairness in the prior deportation proceedings, the second factor that must be present before Anderson can successfully collaterally attack his 1994 deportation order is a deprivation of his right to direct judicial review of that order. *See Espinoza–Farlo*, 34

F.3d at 471; *Mendoza–Lopez*, 481 U.S. at 838–39, 107 S.Ct. 2148. Our discussion on this matter is largely academic in light of Anderson's failure to demonstrate fundamental unfairness due to procedural defects in his 1994 deportation proceedings, but the judicial review issue is particularly interesting and worthy of some attention. Realizing that deportation proceedings are civil in nature, not criminal, paints a telling backdrop for understanding why "[t]he power to expel aliens is essentially a power of the political branches of government ... with such opportunity for judicial review of their action as Congress may see fit to authorize or permit ... judicial review of deportation hearings ... is not guaranteed by the Constitution." *See Benitez–Villafuerte*, 186 F.3d 651, 656–57 (internal quotations and citations omitted) (*quoting Carlson v. Landon*, 342 U.S. 524, 537, 72 S.Ct. 525, 96 L.Ed. 547 (1952)).

However, due process guarantees ratchet up appreciably to prevent error when the government brings its accusatorial machinery to bear against a defendant in a criminal proceeding. Hence, traditional hallmarks of constitutional protections, such as requiring the government to prove the essential elements of an offense beyond a reasonable doubt, inure to Anderson's benefit in this case. The Supreme Court's holding in *Mendoza–Lopez* articulates this aspiration to provide aliens with a higher level of due process than they receive in the civil context when a civil deportation order forms the predicate for a criminal offense under section 1326. As a consequence, where a determination in an INS deportation proceeding plays a critical role in the subsequent imposition of a criminal sanction, "there must be some meaningful review of the administrative proceeding." *Mendoza–Lopez*, 481 U.S. at 837–38, 107 S.Ct. 2148.

§ 1252(g). *Id.* Furthermore, IIRIRA § 306(a) provides that "[n]otwithstanding any other provision of law, no court shall have jurisdiction to review ... any ... decision or action

of the Attorney General the authority for which is specified under [Title 8 U.S.C.] to be in the discretion of the Attorney General...." 8 U.S.C. § 1252(a)(2)(B).

■] Whether the circumstances of Anderson's 1994 deportation deprived him of meaningful judicial review is another matter, however. In *Mendoza–Lopez,* the Court anticipated that where "defects" in the deportation hearing itself completely foreclosed judicial review, some other avenue of judicial review of the deportation order must open. In this case, no inherent "defect". in the deportation proceedings occurred and the Fifth Circuit (we suspect) at least minimally reviewed Anderson's appeal when deciding to deny his request for a stay pending full judicial review. While we seriously question whether this amount of "process" comports the spirit of *Mendoza–Lopez,* a judicial body did render a judgment in the case (albeit not to stay deportation) after the IJ and BIA conducted proceedings that, after all, were not inherently tainted by some constitutional defect. The deeper issue that Anderson does not raise is whether a statute that satisfies due process requirements in civil cases, such as 8 U.S.C. § 1105a(a)(3), which effectively allowed a federal appellate court to divest itself of jurisdiction over an appeal by denying stays of deportation, violates the constitution as applied in the criminal setting by eliminating judicial review of a civil order that subsequently forms the basis of a criminal charge. We need go no farther with this issue today, however, because even if we found that Anderson satisfied the second step of the *Espinoza–Farlo* analysis (in addition to the fast step, *supra* ) and proved that his deportation proceedings deprived him of judicial review to the degree required in *Mendoza–Lopez,* Anderson's second deportation order in 1997, which he chose not to appeal, provided him with a sufficient level of due process to sustain a section 1326 criminal charge.[8]

As grounds for his 1997 deportation, the INS cited Anderson's 1982 convictions, which qualified as both "crimes of moral turpitude" and aggravated felonies. *See* Gov't Ex. 12 (INS "Additional Charges of Deportability," Oct. 21, 1996). Anderson's failure to appeal the IJ's deportation order therefore supplies an independent predicate for a section 1326 charge. Indeed, Anderson's commission of aggravated felonies created a conclusive presumption of deportability (*see* 8 U.S.C. § 1252a(c) (1994) (now codified at § 1228(c))), and, because he reentered the country and was deported after November 1990, Congress had eliminated any possibility for the INS to grant Anderson (or any other aggravated felon for that matter) discretionary relief from deportation. *See Espinoza–Farlo,* 34 F.3d at 471; *cf. Parra v. Perryman,* 172 F.3d 954, 956 (7th Cir.1999) ("One line of argument that cannot be made at any time, in any court, is that a person with a conviction for an aggravated felony is entitled to discretionary relief permitting him to remain in the United States. For someone in [defendant's] position, then, removal is overwhelmingly likely.") (citation omitted). Anderson does not attempt to consider his second deportation under the analysis set forth under *Espinoza–Farlo,* an understandable decision given his express waiver of his right to appeal the IJ's deportation order. *See* Gov't Ex. 14 (indicating Anderson's waiver of the IJ's deportation order and that he "made no relief from deportation").

8. Assuming that Anderson's 1994 deportation proceedings foreclosed judicial review as envisioned in *Mendoza–Lopez,* the parties have not considered whether Anderson's 1996–97 deportation proceedings provided him with "an alternative means of obtaining judicial review" of that 1994 order. 481 U.S. at 838, 107 S.Ct. 2148. The INS cited Anderson's February 22, 1994, deportation when requesting his 1997 deportation, and one would think that Anderson would have jumped at even the slightest opportunity to challenge the basis of the BIA's 1994 findings, especially while engaged in proceedings within the very circuit that dismissed his prior appeal on jurisdictional grounds. *See* Gov't Ex. 12. Because the parties have not addressed that issue or the Fifth Circuit's jurisdiction to hear an appeal at that time, we will refrain from further elaboration since the matter is not essential to our holding today.

Anderson's sole remark in connection with his 1997 deportation is that, but for his allegedly improper 1994 deportation, he never would have reentered the United States illegally. We find this argument unavailing, for even assuming Anderson had correctly believed that his prior 1994 deportation had been in error, he should have challenged the order through legal channels, not by ignoring a still-valid deportation order, avoiding authorities after entering the country illegally, and committing additional crimes. As our circuit has observed: "[A]fter being deported, rather than apply for readmission through legal channels, [defendant] instead knowingly reentered the United States illegally the next day. The latter act makes it difficult to drum up too much sympathy for [defendant's] position." *United States v. Perea–Real,* 96–2689, 1998 WL 108462, at *3 (7th Cir. Mar.3, 1998) (finding that § 1326 defendant failed to demonstrate that his prior deportation proceeding foreclosed judicial review or was fundamentally unfair); *cf. LaGuerre v. Reno,* 164 F.3d 1035, 1040 (7th Cir.1998) (noting that "the deportee can seek review of constitutional issues in the court of appeals directly, as under the prior regime governing judicial review of deportation"; this option provides a "safety valve" to "enable judicial correction of bizarre miscarriages of justice"); *Turkhan v. Perryman,* 188 F.3d 814 (7th Cir.1999) (thoroughly discussing an alien's resort to habeas corpus relief in appellate courts).

As we have said, Anderson failed to seek direct review of the IJ's 1997 deportation order, and his ill-conceived scheme to obtain and illegally use a social security number after his 1994 deportation succeeded only in providing a basis for his second deportation. When Anderson reentered the country illegally after his 1997 deportation, despite having been deported twice, convicted of four separate crimes, and warned that his illegal return would result in criminal penalties, he bore the risk that if caught, his unchallenged 1997 deportation order would prompt a criminal prosecution for illegal reentry by an alien. And so those events have now come to pass, leaving Anderson to mount a collateral attack on his prior deportations under *Espinoza–Farlo,* which imposes a two-step burden that he has failed to carry for either deportation. Anderson effectively accepted the basis of the IJ's March 25, 1997, deportation order when he failed to exhaust his administrative remedy of appealing to the BIA and when he waived any right to appeal generally. We find that Anderson's 1997 deportation order may be used to establish an element of the section 1326 offense as charged in the indictment, and we accordingly *DENY* Anderson's motion to dismiss the indictment.

### Conclusion

For the reasons discussed, Anderson's 1994 and 1997 deportation orders both comport with the level of due process necessary to enable the government to use those civil deportations to establish an element of the section 1326 offense as charged in the indictment. We therefore *DENY* Anderson's motion to dismiss the indictment.

It is so ORDERED.