392 F.3d 1031
 UNITED STATES of America, Plaintiff-Appellant,
American Civil Liberties Union of Northern California Inc.; The National Association of Criminal Defense Lawyers; and California Attorneys for Criminal Justice, Intervenors,
v.
Hossein AFSHARI, aka Hosseini Deklami; Mohammad Omidvar; Hassan Rezaie; Roya Rahmani, aka Sister Tahmineh; Navid Taj, aka Najaf Eshkoftegi; Mustafa Ahmady; Alireza Mohamad Moradi, Defendants-Appellees.
 No. 02-50355.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted September 9, 2003.
 Filed December 20, 2004.
 
 Douglas N. Letter, United States Department of Justice, Washington, DC, for the appellant.
 Stephen P. Berzon, Altshuler, Berzon, Nussbaum, Rubin & Demain, San Francisco, CA, for the appellees.
 Appeal from the United States District Court for the Central District of California; Robert M. Takasugi, District Judge, Presiding. D.C. No. CR-01-00209-RMT.
 Before: KLEINFELD, WARDLAW, and W. FLETCHER, Circuit Judges.
 KLEINFELD, Circuit Judge.
 
 
 1
 We review the constitutionality of a statute prohibiting financial support to organizations designated as "terrorist."
 
 Facts
 
 2
 The issue here is the constitutionality of the crime charged in the indictment, that from 1997 to 2001, Rahmani and others knowingly and willfully conspired to provide material support to the Mujahedin-e Khalq ("MEK"),[1] a designated terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1).[2]
 
 
 3
 According to the indictment, the defendants solicited charitable contributions at the Los Angeles International Airport for the "Committee for Human Rights," gave money and credit cards to the MEK, and wired money from the "Committee for Human Rights" to an MEK bank account in Turkey. They did all this after participating in a conference call with an MEK leader, in which they learned that the State Department had designated the MEK as a foreign terrorist organization. The MEK leader told them to continue to provide material support despite the designation. All told, according to the indictment in this case, the money they sent to the MEK amounted to at least several hundred thousand dollars.
 
 
 4
 The MEK was founded in the 1960s as an Iranian Marxist group seeking to overthrow the regime then ruling Iran. It participated in various terrorist activities against the Iranian regime and against the United States, including the taking of American embassy personnel as hostages in 1979. After the Iranian regime fell and was replaced by a clerical, rather than a Marxist, regime, MEK members fled to France. They later settled in Iraq, along the Iranian border. There they carried out terrorist activities with the support of Saddam Hussein's regime,[3] as well as, if the indictment is correct, the money that the defendants sent them.
 
 
 5
 For purposes of reviewing a motion to dismiss an indictment, we assume the truth of what the indictment alleges.[4] Thus, we take it as true that the defendants knew that they were furnishing assistance to a designated "terrorist" organization, having been informed of the designation in a conference call with an MEK leader.
 
 
 6
 The district court dismissed the indictment on the ground that the terrorist designation statute[5] was unconstitutional. We review de novo,[6] and reverse.
 
 Analysis
 
 7
 I. Challenging the designation.
 
 
 8
 8 U.S.C. § 1189(a)(1) sets out a carefully articulated scheme for designating foreign terrorist organizations. To make the designation, the Secretary has to make specific findings that "the organization is a foreign organization"; that "the organization engages in terrorist activity (as defined in section 1182(a)(3)(B) of this title)"; and that "the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States."[7]
 
 
 9
 The Secretary of State's designation is only the beginning. The Secretary also must furnish the congressional leadership advance notification of the designation and the factual basis for it, which Congress can reject.[8] The designation is published in the Federal Register.[9] The designated organization is entitled to judicial review of the Secretary's action in the United States Court of Appeals for the District of Columbia.[10] That court may set aside the designation for the ordinary administrative law reasons, such as that the designation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[11] That court may also set aside a designation for several other reasons, including that the designation is "contrary to constitutional right, power, privilege, or immunity."[12] The statute limits the duration of a designation to two years,[13] after which the Secretary must repeat the whole process.[14] Congress or the Secretary, however, can revoke a designation sooner.[15] Among the concrete incentives that a designated organization has to contest the designation is that the Secretary of the Treasury may require American financial institutions to block all financial transactions involving its assets.[16]
 
 
 10
 The district court found that it was a facially unconstitutional restriction on judicial review of the designation for Congress to assign such review exclusively to the D.C. Circuit. We reject that position.
 
 
 11
 Many administrative determinations are reviewable only by petition to the correct circuit court, bypassing the district court, and that procedure has generally been accepted.[17] Many are reviewable only in the D.C. Circuit, or the Federal Circuit, and those restrictions have also been generally accepted.[18] The congressional restriction does not interfere with the opportunity for judicial review, as the MEK's extensive litigation history shows. And this scheme avoids the awkwardness of criminalizing material support for a designated organization in some circuits but not others, as varying decisions in the different regional circuits might.
 
 
 12
 However, a holding that a restriction of judicial review of the Secretary of State's designation of a terrorist organization to the Court of Appeals for the D.C. Circuit is not facially unconstitutional does not settle the question whether a defendant may be criminally prosecuted for donating to a designated organization. A district court in which such a defendant is criminally prosecuted may bring a due process challenge to his or her prosecution for donating to such an organization. The district court properly ruled that it had jurisdiction to review this challenge. But its conclusion that § 1189 is facially unconstitutional because judicial review was assigned exclusively to the D.C. Circuit was in error.
 
 
 13
 II. Due Process claim.
 
 
 14
 The statute assigns criminal penalties to one who "knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so."[19] The statutory phrase "terrorist organization" is a term of art, defined by Congress as "an organization designated as a terrorist organization" under 8 U.S.C. § 1189(a)(1). The defendants' central argument is that § 2339B denies them their constitutional rights because it prohibits them from collaterally attacking the designation of a foreign terrorist organization. This contention was recently rejected by the Fourth Circuit en banc.[20] We, too, reject it.
 
 
 15
 The specific section that is at issue here is 8 U.S.C. § 1189(a)(8), which states in relevant part:
 
 
 16
 If a designation ... or if a redesignation under this subsection has become effective ... a defendant in a criminal action or an alien in a removal proceeding shall not be permitted to raise any question concerning the validity of the issuance of such designation or redesignation as a defense or an objection at any trial or hearing.
 
 
 17
 The defendants are right that § 1189(a)(8) prevents them from contending, in defense of the charges against them under 18 U.S.C. § 2339B, that the designated terrorist organization is not really terrorist at all. No doubt Congress was well aware that some might be of the view that "one man's terrorist is another man's freedom fighter." Congress clearly chose to delegate policymaking authority to the President and Department of State with respect to designation of terrorist organizations, and to keep such policymaking authority out of the hands of United States Attorneys and juries. Under § 2339B, if defendants provide material support for an organization that has been designated a terrorist organization under § 1189, they commit the crime, and it does not matter whether the designation is correct or not.
 
 
 18
 The question then is whether due process prohibits a prosecution under § 2339B when the predicate designation was obtained in an unconstitutional manner or is otherwise erroneous. In Lewis v. United States, the Supreme Court held that a prior conviction could properly be used as a predicate for a subsequent conviction for a felon in possession of a firearm, even though it had been obtained in violation of the Sixth Amendment right to counsel.[21] The Court held that it was proper to prohibit a collateral attack on the predicate during the criminal hearing because the felon-in-possession statute made no exception "for a person whose outstanding felony conviction ultimately might turn out to be invalid for any reason."[22] The Court noted that the prohibition on collateral attack was proper because a convicted felon could challenge the validity of the conviction before he purchased his firearm.[23]
 
 
 19
 The defendants attempt to distinguish Lewis from this § 2339B prosecution because the defendant in Lewis had the ability to challenge his predicate, whereas here the defendants, themselves, are prohibited from challenging the designation. But this does not change the principle that a criminal proceeding may go forward, even if the predicate was in some way unconstitutional, so long as a sufficient opportunity for judicial review of the predicate exists. Here there was such an opportunity, which the MEK took advantage of each time it was designated a foreign terrorist organization.[24]
 
 
 20
 The defendants also attempt to distinguish Lewis by relying on United States v. Mendoza-Lopez.[25] In that case, the Supreme Court held that a prosecution under 8 U.S.C. § 1326 for illegal reentry does not comport with due process if there is no judicial review of whether the predicate deportation proceeding violated the alien's rights.[26] It is not at all clear from Mendoza-Lopez that the Supreme Court meant that the due process problem is in the later proceeding. The Court held that "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding."[27] Nothing in Mendoza-Lopez appears to require that this review be had by the defendant in the subsequent criminal proceeding.
 
 
 21
 Furthermore, it is obvious in Lewis and Mendoza-Lopez that the opportunity to seek review would be in the hands of the defendants themselves because it was their rights at issue in the hearing that created the predicate in the later criminal proceeding. But here, the defendants' rights were not directly violated in the earlier designation proceeding. The predicate designation was against the MEK, not the defendants. Section 1189 provides for the organizations to seek review of the predicate designation, and that review was had in this case. Therefore, due process does not require another review of the predicate by the court adjudicating the instant § 2339B criminal proceeding.
 
 
 22
 Our holding is further supported by our decision in United States v. Bozarov.[28] In Bozarov, we held that a defendant charged with exporting items listed under the Export Administration Act without a license did not have a due process right to collaterally attack the listing in his criminal proceeding.[29] We held, however, that Bozarov had standing to challenge the constitutionality of the Export Act in his criminal proceeding.[30] This was because the Export Act explicitly provided that all actions taken by the Secretary of Commerce under it were "not subject to judicial review," including a denial of the license that was a predicate for a violation of the criminal provision.[31] If a defendant were not allowed to challenge the Export Act in that proceeding, there would be no arbiter of the constitutionality of the Export Act. In contrast, Congress has explicitly provided that the D.C. Circuit is the arbiter of the constitutionality of any designation under § 1189. Thus, there is no constitutional need for the defendants to challenge the predicate designation in this proceeding.
 
 
 23
 As we noted in another case where we rejected a defendant's right to challenge an export listing in a subsequent criminal proceeding, the defendants' argument here "is analogous to one by a defendant in a drug possession case that his conviction cannot stand because no specific showing has been made that the drug is a threat to society....[A] showing that the drug possessed by the individual defendant has a `detrimental effect on the general welfare' [is not] an element of the offense."[32] Likewise, the element of the crime that the prosecutor must prove in a § 2339B case is the predicate fact that a particular organization was designated at the time the material support was given, not whether the government made a correct designation. Our position is consistent with that of the Fourth Circuit, which held that a defendant's inability to challenge the designation was not a violation of his constitutional rights, since the validity of the designation is not an element of the crime.[33] Rather, the element is the fact of an organization's designation as a "foreign terrorist organization."[34]
 
 
 24
 III. First Amendment claim.
 
 
 25
 The defendants argue that (1) they have a First Amendment right to contribute to organizations that are not terrorist; (2) the statutory scheme denies them the opportunity to challenge the "foreign terrorist organization" designation; therefore (3) it deprives them of their First Amendment right to make such contributions. An organization cannot be designated unless it is foreign,[35] so domestic associations are immune from the scheme. Nevertheless, the defendants assert their own First Amendment rights to contribute to the advancement of their own goals that may be served by the designated foreign terrorist organization. The defendants do not claim a First Amendment right to support terrorism, but rather to support an organization that the State Department, in their view, mistakenly designates as terrorist.
 
 
 26
 Defendants cite to various general propositions about the protection given to association and expression, and the need to give money in order to make expression effective.[36] Those general propositions, however, do not take us far toward reaching a decision. Defendants persuasively argue that haranguing people in a Los Angeles park about the evils of some foreign regime may be less effective than sending money to someone doing something about it. But money is not the same thing as talk,[37] and the something being done may be something other than talking. Even giving money to perfectly legitimate political expression within the United States can be and is restricted by Congress, consistent with the Constitution.[38] A fortiori, contribution of money to organizations that engage in terrorism, as well as expressing a political agenda with speech, can be restricted by Congress. Terrorism is defined by the statute as "politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."[39]
 
 
 27
 It would be anomalous indeed if Congress could prohibit the contribution of money for television commercials saying why a candidate would be a good or bad choice for political office, yet could not prohibit contribution of money to a group designated as a terrorist organization. Thus, we hold that § 2339B does not impermissibly restrict the defendants' First Amendment right of association.
 
 
 28
 The authority upon which the defendants most heavily rely is the Supreme Court's decision in McKinney v. Alabama.[40] In McKinney, an Alabama statute enabled the district attorney to obtain a civil adjudication of obscenity against a magazine called New Directions.[41] Subsequently the State Attorney General's office delivered a letter to the proprietor of a Birmingham newsstand, telling him that New Directions and three other magazines had been declared obscene.[42] A few days later, the officers from the Attorney General's office went back and bought a copy of New Directions from the newsstand and charged the proprietor with selling obscene printed matter.[43] The constitutional issue arose out of the proprietor's attempt to have the jury in his criminal case decide whether New Directions really was obscene.[44] The trial court determined that the obscenity of the magazine had already been established by the civil proceeding so the jury could decide only whether the proprietor had sold it.[45]
 
 
 29
 The Supreme Court of Alabama affirmed the trial court's judgment. On review, the United States Supreme Court held that "the procedures utilized by the State of Alabama, insofar as they precluded [the proprietor] from litigating the obscenity vel non of New Directions as a defense to his criminal prosecution, violated the First and Fourteenth Amendments."[46] The Court found that "[t]here [was] nothing in the opinion of the Supreme Court of Alabama indicating that petitioner had available to him any judicial avenue for initiating a challenge to the Mobile declaration as to the obscenity of New Directions."[47]
 
 
 30
 There are several reasons why McKinney is distinguishable and does not apply. The plainest logical distinction between the statutes is that the Alabama statute prohibited sale of "obscene printed or written matter,"[48] making obscenity an element of the crime, whereas § 2339B prohibits material assistance to "designated" organizations. To see the distinction, one must consider the entire statutory scheme, because if one does not read the definitions subsection, § 2339B appears to be analogous to the Alabama statute — prohibiting material assistance to "foreign terrorist organizations" as the Alabama statute prohibits sale of "obscene" material. But § 2339B defines "foreign terrorist organization" to mean one that has been "designated" by the elaborate procedure described above.[49] If the material assistance is rendered to a "foreign terrorist organization" in the common sense meaning of the English words, but the organization is not on the list of "designated" organizations, the crime is not committed. This is a meaningful distinction. The list of "designated" organizations in the Federal Register has only 30 organizations on it,[50] even though it is very likely that there are additional organizations that meet the substantive criteria for designation as foreign terrorist organizations. Conversely, if the material assistance is to a "designated" foreign terrorist organization, the crime is committed regardless of whether the designation was erroneous, or whether the organization has changed so that it is no longer terrorist.
 
 
 31
 The Alabama and federal statutory schemes also differ in a practical way, because the Alabama statute does not create an incentive to litigate whether the material is "obscene" in the equitable action preceding the criminal action, whereas the federal scheme does. The publisher of New Directions might well have ignored the equitable proceeding to declare the magazine obscene because attorneys' fees would exceed the business value of the litigation, and the Court noted that the record did not show much about the participation of any adverse parties.[51] Under the federal scheme, in contrast, the organization has a very substantial incentive to litigate its designation, and the MEK did, vigorously.
 
 
 32
 After the Secretary of State designated the MEK a "foreign terrorist organization" in 1997, the MEK challenged the designation in the United States Court of Appeals for the District of Columbia, and lost.[52] When the Secretary renewed the designation in 1999, the MEK litigated it again, this time successfully.[53] The D.C. Circuit remanded to the Secretary for renewed consideration with greater procedural protections for the MEK.[54] When the Secretary again designated the MEK as a foreign terrorist organization on a new administrative record, the MEK brought its third challenge in the D.C. Circuit, which this time upheld the designation.[55] The D.C. Circuit also reconsidered the 1997 designation on the merits and again upheld it, expressly anticipating the possibility of a criminal prosecution based on either designation.[56] Such extensive and serious litigation is a far cry from a magazine publisher disregarding a local designation proceeding against an individual magazine, perhaps because the cost of litigation could not generate commensurate benefits. But in this case, the stakes and incentives are far different, and the MEK protected its interests vigorously.
 
 
 33
 Conceivably the MEK developed its practices at a time when the United States supported the previous regime in Iran, and maintained its position while harbored by the Saddam Hussein Ba'ath regime in Iraq, but will change, or has already changed, so that its interest in overturning the current regime in Iran coincides with the interests of the United States. The sometimes subtle analysis of a foreign organization's political program to determine whether it is indeed a terrorist threat is peculiarly within the expertise of the State Department and the Executive Branch. Juries could not make reliable determinations without extensive foreign policy education and the disclosure of classified materials. Leaving the determination to the Executive Branch, coupled with the procedural protections and judicial review afforded by the statute, is both a reasonable and a constitutional way to make a determination of whether a group is a "foreign terrorist organization." The Constitution does not forbid Congress from requiring individuals, whether they agree with the Executive Branch determination or not, to refrain from furnishing material assistance to designated organizations during the two year period of designation.
 
 
 34
 REVERSED.
 
 
 
 Notes:
 
 
 [1]
 The MEK is also known as the People's Mojahedin Organization for Iraq, or PMOI, and has a variety of other aliases
 
 
 [2]
 In 1997, the Secretary of State designated the MEK as a foreign terror ist organization under 8 U.S.C. § 1189
 
 
 [3]
 The 1997-2001 period of the conspiracy charged in the indictment was during Saddam Hussein's regime
 
 
 [4]
 United States v. Jensen, 93 F.3d 667, 669 (9th Cir.1996).
 
 
 [5]
 8 U.S.C. § 1189
 
 
 [6]
 United States v. Barrera-Moreno, 951 F.2d 1089, 1091 (9th Cir.1991).
 
 
 [7]
 8 U.S.C. § 1182(a)(3)(B)(ii). Terrorist activity defined. As used in this Act, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed ... and which involves any of the following:
 (I) The highjacking or sabotage of any conveyance ...
 (II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person ... to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.
 (III) A violent attack upon an internationally protected person... or upon the liberty of such a person.
 (IV) An assassination.
 (V) The use of any —
 (a) biological agent, chemical agent, or nuclear weapon or device, or
 (b) explosive or firearm ...,
 with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.
 (VI) A threat, attempt, or conspiracy to do any of the foregoing.
 22 U.S.C. § 2656f(d)(2). [T]he term "terrorism" means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents.
 
 
 [8]
 Id. § 1189(a)(2)(A)(i).
 
 
 [9]
 Id. § 1189(a)(2)(A)(ii).
 
 
 [10]
 Id. § 1189(b)(1).
 
 
 [11]
 Id. § 1189(b)(3)(A).
 
 
 [12]
 Id. § 1189(b)(3)(B).
 
 
 [13]
 Id. § 1189(a)(4)(A).
 
 
 [14]
 Id. § 1189(a)(4)(B).
 
 
 [15]
 Id. § 1189(a)(5), (6).
 
 
 [16]
 Id. § 1189(a)(2)(C).
 
 
 [17]
 See, e.g., City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 336, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958); Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943) (holding that a district court lacked jurisdiction to hear a challenge to price controls under the Emergency Price Controls Act where Congress had vested judicial review for such challenges in an Emergency Court of Appeals).
 
 
 [18]
 See, e.g., 47 U.S.C. § 402(b) (vesting exclusive jurisdiction in the D.C. Circuit over appeals from certain decisions and orders of the Federal Communication Commission).
 
 
 [19]
 18 U.S.C. § 2339B. Providing material support or resources to designated foreign terrorist organizations
 (a) Prohibited activities —
 (1) Unlawful conduct — Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.
 
 
 [20]
 United States v. Hammoud, 381 F.3d 316 (4th Cir.2004) (en banc).
 
 
 [21]
 Lewis v. United States, 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980).
 
 
 [22]
 Id. at 62, 100 S.Ct. 915.
 
 
 [23]
 Id. at 64, 100 S.Ct. 915.
 
 
 [24]
 See People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17 (D.C.Cir.1999); Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192 (D.C.Cir.2001); People's Mojahedin Org. of Iran v. Dep't of State, 327 F.3d 1238 (D.C.Cir.2003).
 
 
 [25]
 United States v. Mendoza-Lopez, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987).
 
 
 [26]
 Id. at 837-38, 107 S.Ct. 2148.
 
 
 [27]
 Id. (emphasis in original).
 
 
 [28]
 United States v. Bozarov, 974 F.2d 1037 (9th Cir.1992).
 
 
 [29]
 Id. at 1045-46.
 
 
 [30]
 Id. at 1040-41.
 
 
 [31]
 Id. at 1039.
 
 
 [32]
 United States v. Mandel, 914 F.2d 1215 n. 11 (9th Cir.1990) (quoting Spawr Optical Research, Inc. v. Baldrige, 649 F.Supp. 1366, 1372 n. 10 (D.D.C.1986)).
 
 
 [33]
 United States v. Hammoud, 381 F.3d 316, 331 (4th Cir.2004) (en banc).
 
 
 [34]
 Id.
 
 
 [35]
 8 U.S.C. § 1189(a)(1)(A)
 
 
 [36]
 See Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Serv. Employees Int'l Union v. Fair Political Practices Comm'n, 955 F.2d 1312 (9th Cir.), cert. denied, 505 U.S. 1230, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992).
 
 
 [37]
 Cf. McConnell v. Fed. Election Comm'n, 540 U.S. 93, 124 S.Ct. 619, 721-22, 157 L.Ed.2d 491 (2003) (Scalia, J., concurring and dissenting) ("The right to use one's own money to hire gladiators, and to fund speech by proxy, are property rights not entitled to the same protection as the right to say what one pleases.") (quotation and alterations omitted).
 
 
 [38]
 See McConnell, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491; Buckley, 424 U.S. 1, 20, 96 S.Ct. 612, 46 L.Ed.2d 659 ("[A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication.").
 
 
 [39]
 22 U.S.C. § 2656f(d)(2)
 
 
 [40]
 McKinney v. Alabama, 424 U.S. 669, 96 S.Ct. 1189, 47 L.Ed.2d 387 (1976).
 
 
 [41]
 Id. at 670-72, 96 S.Ct. 1189.
 
 
 [42]
 Id. at 672, 96 S.Ct. 1189.
 
 
 [43]
 Id., 672-73, 96 S.Ct. 1189.
 
 
 [44]
 Id. at 673, 96 S.Ct. 1189.
 
 
 [45]
 Id.
 
 
 [46]
 Id.
 
 
 [47]
 Id. at 674, 96 S.Ct. 1189.
 
 
 [48]
 Id. at 672 n. 2, 96 S.Ct. 1189.
 
 
 [49]
 See 8 U.S.C. § 1189.
 
 
 [50]
 See 68 Fed.Reg. 56,860 (2003); 68 Fed.Reg. 74,282 (2003); 69 Fed.Reg. 13,347 (2004).
 
 
 [51]
 McKinney, 424 U.S. at 675 & 675 n. 5, 96 S.Ct. 1189.
 
 
 [52]
 People's Mojahedin Org. of Iran, 182 F.3d 17. F
 
 
 [53]
 Nat'l Council of Resistance of Iran, 251 F.3d 192.
 
 
 [54]
 Id. at 208-09.
 
 
 [55]
 People's Mojahedin Org. of Iran, 327 F.3d 1238.
 
 
 [56]
 Id. at 1244 n. 2.